# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**TINA M. REPP,**

                          **Plaintiff,**

**-vs-**                                              **Case No.  6:05-cv-1784-Orl-31JGG**

**JO ANNE BARNHART,**

                          **Defendant.**

_____

# REPORT AND RECOMMENDATION

Plaintiff Tina M. Repp ["Repp"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying her application for a period of disability and disability insurance benefits.  *See* Docket No. 1 (complaint).  For the reasons set forth below, the Commissioner's decision should be **AFFIRMED**.

## I.    PROCEDURAL HISTORY

On November 27,2002, Repp filed an application for Disability Insurance Benefits, claiming disability as of April 18, 2002 due to injuries to both her hands, arms, shoulders, knees, and injuries to her neck, back, and head.  R. 69.  The claim was denied initially and on reconsideration. R. 34, 37.  On March 30, 2005, the Honorable Robert D. Marcinkowski, Administrative Law Judge ["ALJ"], held a fifty four-minute hearing on Repp's claim in Melbourne,

Florida.  R. 571A -612A.[1]  Attorney Bruce W. Jacobus, Jr. represented Repp at the hearing.  R. 573.

The ALJ heard testimony from Repp and vocational expert Natalie Tessari.

On August 18, 2005, the ALJ issued a decision that Repp was not disabled and not entitled to

benefits.  R. 26.  Following a review of the medical and other record evidence, the ALJ found that

Repp could not perform her past relevant work as a truck driver.  R. 25, Finding 7.  The ALJ found

that Repp nevertheless retained the residual functional capacity ["RFC"] to perform a significant range

of the physical exertional requirements of light work.  R. 25, Finding 11.  Applying the Medical-

Vocational Guidelines, the ALJ concluded that Repp was not disabled.  R. 25, Finding 13.

On October 3, 2005, the Appeals Council denied review.  R. 7.  On December 1, 2005, Repp

timely appealed the Appeals Council's decision to the United States District Court.  Docket No. 1 at

1-3.  On May, 8, 2006, Repp filed in this Court a memorandum of law in support of her appeal.

Docket No. 9.  On August 4, 2006, the Commissioner filed a memorandum in support of her decision

that Repp was not disabled.  Docket No. 12.  The appeal is ripe for determination.

## II.    THE PARTIES' POSITIONS

Repp assigns five errors to the Commissioner.  First, Repp claims that the Commissioner erred

by not giving adequate weight to treating physicians' opinions.  Docket No. 9 at 9-12.  Second, Repp

claims that the Commissioner erred in providing an improper hypothetical to a vocational expert.  *Id*.

at 12-14.  Third, Repp claims that the Commissioner erred by failing to properly evaluate Repp's pain

and subjective symptoms.  *Id*. at 14-17.  Fourth, Repp claims that the Commissioner failed to consider

---

[1]The Court notes that the transcript of the March 30, 2005, administrative hearing is erroneously numbered in the certified transcript.  The transcript is correctly numbered consecutively up to page 670.  After that page, the administrative hearing appears stamped as page numbers 571 through 612.  To avoid confusion, the Court will cite to the hearing transcript pages as R. 571A through R. 612A.

the combined effect of all Repp's impairments. *Id*. at 17-18. And fifth, Repp claims that the Commissioner incorrectly disregarded Repp's pain testimony. *Id*. at 18-19.

The Commissioner argues that substantial evidence supports her decision to deny disability. First, the Commissioner argues that the Commissioner properly discounted treating source opinions that were inconsistent with the record evidence. Docket No. 12 at 6-7. Second, the Commissioner argues that the ALJ accurately represented all of the plaintiff's limitations in his hypothetical to the vocational expert. *Id*. at 4-6, 12. Third, the Commissioner argues that the ALJ complied with the appropriate standards for evaluating subjective pain testimony. *Id*. at 7-9 . Fourth, the Commissioner argues that all of Repp's impairments were considered in the ALJ's decision. *Id*. at 11. Fifth, the Commissioner argues that the ALJ properly disregarded Repp's testimony because it was inconsistent with her own statements to various treating sources throughout the record. *Id*. at 9-11.

## III.   **THE STANDARD OF REVIEW**

### A.   **AFFIRMANCE**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

-3-

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

## B. REVERSAL

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405(g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984). A claimant may be entitled to an immediate

award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

### C.     REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of  42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to

consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).   After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g). To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also*, *Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant.  *Jackson*, 99 F.3d at 1095.  With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact.  *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[2]  *Id.*

---

[2]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.*

## IV.   THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

### A.   DEVELOPING THE RECORD

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all

---

Any Plaintiff intending to seek attorney's fees for past-due benefits under 42 U.S.C. § 406 (b)(1)(A) shall move the Court to include in any remand order an extension of the 14-day period described in Fed. R. Civ. P. 54 (d)(2)(B) so as to specify an extended deadline that follows the Commissioner's determination of Plaintiff's past-due benefits. *Bergen v. Comm'r of Soc. Sec.*, 454 F. 3d 1273, 1278 n.2 (11th Cir. 2006).

the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Cowart*, 662 F.2d at 735 (citations omitted).

### B.     THE FIVE STEP EVALUATION

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education, and past work) prevent him or her from doing other work that exists in the national economy, then claimant is disabled. 20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and

-8-

well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985 F.2d at 534.  A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly.  *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work.  *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).  In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"].  This assessment measures whether a claimant can perform past relevant work despite his or her impairment.  20 C.F.C. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).  The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull.  *See* 20 C.F.C. § 404.1545(b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant.  *See* SSR 82-61.  If so, the claimant is not disabled.  If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy.  SSR  82-61.  In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy.  20 C.F.C. § 404.1567.

The claimant must prove disability on or before the last day of his or  her insured status for the purposes of disability benefits.  *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v.*

*Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416(i)(3); 423(a), (c).  If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite the claimant's disability.  *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

### C.     OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"].  *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).  Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987).  In almost all of such cases, the Commissioner's burden can be met only through the use of a

vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### D.    TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician. *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v. Commissioner of Social Security*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements). Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a

-12-

physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner. 20 C.F.R. § 404.1527(e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence. *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### E.    PAIN

Pain is a non-exertional impairment. *Foote*, 67 F.3d at 1559; 826 F.2d at 1003. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1529. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

-13-

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone

can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*,

957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself,

conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

### F.    CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate

specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.

*Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th

Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not

disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See*

*Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054

(11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective

pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon*

*v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when

credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352

(11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination

is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the

implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d

at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit

finding as to credibility is required, the implication must be obvious to the reviewing court).

-14-

**G.     MEDICAL TESTS AND EXAMINATIONS**

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

**H.     THE EVALUATION OF MENTAL DISORDERS**

The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such impairment may impose on the individual's ability to work.  The listings for mental disorders are arranged in nine diagnostic categories.  20 C.F.R. Pt. 404, Subpt. P, App. 1.   The criteria in paragraphs B and C of the listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work — i.e. limitations in functional areas deemed essential to work.  A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings.  20 C.F.R. § 404.1526.  An individual meeting or equaling the criteria could not reasonably be expected to engage in gainful work activity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

-15-

Individuals who have an impairment with a level of severity which does not meet the criteria of the listings for mental disorders may or may not have the residual functional capacity ["RFC"] which would enable them to engage in substantial gainful work activity. The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled, but the impairment is nevertheless severe. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment. Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (activities of daily living; social functioning; concentration, persistence, or pace; and ability to tolerate increased mental demands associated with competitive work). A "marked" degree of limitation means more than moderate, but less than extreme. A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The technique is used in connection with the sequential evaluation process. *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living; social

-16-

functioning;  concentration, persistence and pace;  or ability to tolerate increased mental demands (stress).  This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports.  It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerably over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor.  Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Some individuals may actually have worked during the period of time pertinent to the determination of disability.  Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms. Such individuals may be much more impaired for work than their signs and symptoms would indicate. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The results of a single examination may not adequately describe these individuals' sustained ability to function. It is, therefore, vital to review all pertinent information relative to the individual's condition, especially at times of increased stress. 20 C.F.R. Pt. 404, Subpt. P, App. 1. It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the individual either currently, or in the time period relevant to the decision. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function. 20 C.F.R. Pt. 404, Subpt. P, App. 1. While psychotropic medications may control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist. These functional restrictions are also to be used as the measure of impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to temporary remission. In assessing whether medical improvement has occurred in persons with this type of

-18-

impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening.  Improvement in such impairments that is only temporary will not warrant a finding of medical improvement.  20 C.F.R. § 404.1594 (iv).

## V.    **APPLICATION AND ANALYSIS**

### A.    **THE FACTS**

From July 21, 1993 to April 19, 1996, Repp saw Carlos Woodward, M.D. regarding various problems with both of her hands, including pain in both thumbs, numbness and tingling.  R. 265-88.  During this period, Dr. Woodward performed endoscopic carpal tunnel release, basilar thumb reconstruction, basilar thumb arthroplasty, interpositional arthroplasty with ligament reconstruction, and injections.[3]  *Id*.  On April 19, 1996, Dr. Woodward opined that Repp was "at the point where she is probably as good as she is going to get" and recommended vocational rehabilitation and retraining so that Repp could "use her thumbs for whatever she feels comfortable doing."  R. 265.

On  September 12, 1997, Repp returned to Dr. Woodward complaining of diffuse pain in her hands.  R. 264.  Provocative tests for carpal tunnel were negative, and Dr. Woodward noted that he had "little to offer" Repp, and recommended continued use of anti-inflammatory drugs.  *Id*.

On April 2, 2001, Repp was admitted to Holmes Regional Medical Center following a work related accident, where the dump truck that she was driving rolled over off of a bridge and into a canal.  R. 146.  Repp complained of a brief loss of consciousness after the accident, coughing up water, and pain in her left shoulder.  *Id*.  Repp denied any other injuries.  *Id*.  Admitting physician Edward

---

[3]Dr. Woodward's notes are not clear as to which of Repp's hands received which procedure.  The notes indicate, however, that Repp reached maximum medical improvement for her "other hand" on June 9, 1995, had an 8% impairment rating for "her two carpal tunnels" and CMC ligament reconstruction.  R. 273.

Figueroa, M.D. released Repp on April 3, 2001, diagnosing status post motor vehicle collision; possible aspiration; cerebral concussion; soft tissue injury to the left shoulder; and lumbar strain. *Id.* Dr. Figueroa prescribed Flexeril and Motrin for pain and inflammation. *Id.*

On April 6, 2001 Repp sought treatment from Olsen Crofton, M.D., complaining of upper back and muscle tenderness. R. 553-54. Dr. Crofton noted that Repp had not been taking the Flexeril prescribed by Dr. Figueroa, and recommended that Repp continue medication and that she talk to her boss to see if she could work "half days." R. 553. Repp returned to Dr. Crofton on April 12, 2001, complaining of muscular pain, rare headaches, and problems with her upper back and left arm. R. 550. Dr. Crofton recommended physical therapy. *Id.*

Repp requested a transfer of care, and on May 7, 2001, Repp sought treatment from Homi S. Cooper, M.D., who diagnosed cervical sprain, lumbosacral sprain with possible radiculopathy, and left shoulder pain. R. 172-74. Dr. Cooper prescribed: Ultram, Vioxx, and Skelaxin; four weeks of physical therapy; and an MRI of the lumbar spine and left shoulder. R. 174. Dr. Cooper further recommended that Repp return to work with the restrictions on heavy lifting; lifting no more than 20 pounds; and no forceful pushing or pulling. *Id.*

On May 16, 2001 Repp underwent an MRI of the cervical and lumbar spine and left shoulder. R. 556-58. The Cervical scan revealed spondylosis at C4-5, C5-6 and C6-7 most pronounced at the C6-7 level with osteophyte formation and posterocentral annular bulges resulting in narrowing of the subarachnoid spaces. R. 556. The lumbar scan was negative, except for mild articular facet hypertrophy bilaterally at l3-4 and l4-5. R. 557. The left shoulder scan revealed a down sloping

-20-

acromion and small inferior osteophyte touching and effacing the supraspinatus musculotendinous junction. R. 558.  The indication for all three scans were sprain.  R. 556-558.

On June 4, 2001, Dr. Cooper examined Repp and reviewed the May 16, 2001 MRI.  R. 170. Repp complained of continued left shoulder pain, but Dr. Cooper noted that Repp's physical therapy had helped, her low back pain was "feeling much better," and that her neck had "good and bad days." *Id*.  Dr. Cooper prescribed Skelaxin and ginger root capsules; home exercise; ordered an MRI of Repp's brain.  *Id*.  He further recommended that Repp continue working, but restricted her to lifting no more than 30 pounds.  *Id*.

On June 26, 2001, Repp returned to Dr. Cooper complaining of headaches, tightness in her neck, and worsening pain in left shoulder, neck, and low back.  R. 169.  Dr. Cooper's examination revealed "relatively good" range of motion in the shoulder and normal cervical movement.  *Id*.  He also reviewed a brain MRI scan dated June 20, 2001, and noted that it was "completely normal."  *Id*. Dr. Cooper prescribed a soft cervical collar and Skelaxin, and again restricted Repp to lifting no more than 30 pounds.  *Id*.

On August 27, 2001 Repp saw Dr. Cooper for neck pain, headaches, pain in both arms from the mid to upper arm to the mid forearm, left shoulder pain, pain in both knees, and low back pain radiating down both hips to the knees.  R. 167.  Repp's cervical spin and lumbosacral motion were "relatively good" and "done well."  *Id*.  Straight leg raising was negative bilaterally, and Repp could walk "well on her heels and her toes."  *Id*.  Dr. Cooper recommended and EMG and nerve conduction study, prescribed Skelaxin, and that Repp return to her regular job duties with no heavy lifting, and lifting no more than 30-45 pounds.  R. 167-68.

On September 11, 2001, Repp saw Paul S. Beighley, M.D., for insomnia, low grade depression, irritability and anxiety.  R. 522.  Dr. Beighley diagnosed anxiety disorder, but ruled out depressive disorder and personality disorder, and assigned Repp a GAF of 60.[4]  *Id*.  Dr. Beighley increased Repp's Zoloft prescription and further prescribed Desyrel for insomnia.  *Id*.

On October 4, 2001, Repp visited Dr. Cooper, who reviewed Repp's EMG and nerve conduction studies dated September 27, 2001, which "showed no evidence of peripheral mononeuropathy or radiculopathy."  R. 165.  Repp complained of continued pain in her back and neck and weakness and pain in her left shoulder.  *Id*.  Dr. Cooper encouraged Repp to "discuss her situation with the Bureau of Vocational Rehabilitation," but again cleared her for her regular job duties subject to 30-45 pound weight limitation.  *Id*.

On November 2, 2001, Repp returned to Dr. Woodward, complaining of pain, numbness, and tingling in both hands.  R. 263.  She tested positive for carpal tunnel bilaterally, and Dr. Woodward opined that carpal tunnel was the likely cause of Repp's symptoms, as opposed to cervical entrapment.  *Id*.  Repp visited Dr. Woodward again November, 26, 2001, and he recommended redoing Repp's carpal tunnel release and ulnar pad flap.  R. 262.

On December 10, 2001 Repp underwent a surgical repair of an "incisional" hernia performed by Bruce E Alper, M.D.  R. 158.  In a follow-up visit on December 27, 2001, Dr. Alper opined that

---

[4]The Global Assessment of Functioning (GAF) scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, or unable to care for himself).  *Diagnostic and Statistical Manual of Mental Disorders - Fourth Edition* (DSM-IV) 32 (4th ed. 1994).  A score between 51 and 60 is defined as moderate symptoms (e.g. flat aspect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational , or school functioning (e.g. few friends, conflicts with peers or co-workers).  *Id*. at 32.

Repp was "healing well" and that she could return to work on January 10, 2001 (sic)[5] with no restrictions.  R. 56.

On January 8, 2002, Dr. Beighley again examined Repp, this time diagnosing depressive disorder NOS, personality disorder NOS in addition to Repp's earlier anxiety disorder, but did not change Repp's GAF, which remained at 60.  R. 521.  Treatment was to switch from Zoloft to Prozac and to increase the Desyrel dosage, and Dr. Beighley recommended psychotherapy.  *Id*.

Repp visited Dr. Cooper for the last time on January 15, 2002, complaining of "terrible" neck pain and frequent headaches, pain in both shoulders and scapular regions – shooting into both breasts, difficulty breathing due to mid thoracic pain, lower back pain radiating down both thighs and anterior lower legs, difficulty standing on the left foot, and ringing in both ears.  R. 161.  Dr. Cooper recommended an evaluation for tinnitus, prescribed Vioxx and Ultracet, and maintained that Repp could continue working with lifting limitations of no more than 30-45 pounds.  *Id*.

On February 5, 2002, Dr. Beighley noted that Repp's anxiety and depressive disorders were in partial remission, and assigned her a GAF of 65.  R. 520.  Treatment was to increase Desyrel dosage as tolerated and Dr. Beighley again recommended psychotherapy.  *Id*.

On March 13, 2002, Repp sought a second opinion from Jeffrey Greenspoon, M.D., at the request of her worker's compensation carrier.  R. 490.  Dr. Greenspoon reviewed her treatment record and added Repp's bilateral carpal tunnel syndrome and related surgeries, cervical and lumbosacral spondylosis, brachial neuritis, left rotator cuff syndrome, and knee derangement to her list of conditions.  R. 496.  Dr. Greenspoon generally recommended ice, non steroidal anti-inflammatories,

---

[5]The correct back-to-work date is January 10, 2002.

and physical therapy for treatments. *Id.* For Repp's left shoulder, Dr. Greenspoon recommended arthroscopic surgery with subacromial depression and distal clavicle resection. R. 497. As far as work restrictions, Dr. Greenspoon recommended "light duty" with maximum lifting of 20 pounds, with occasional reaching above shoulders, pushing and pulling, and occasional overhead lifting.

Dr. Beighley saw Repp again on April 3, 2002. R. 519. His diagnosis remained unchanged — but he again recommended psychotherapy, and prescribed an increase in Repp's Prozac dosage and continued Trazodone. *Id.*

Repp visited Dr. Greenspoon again on April 8, 2002, with no changes to her condition. R. 488. On April 30, 2002 Dr. Greenspoon performed arthroscopic surgery on Repp's left shoulder with a postoperative diagnosis of multi-directional instability, impingement syndrome, AC joint arthritis, and partial inferior surface rotator cuff tear. R. 485. On June 10, 2002, Dr. Greenspoon examined Repp and determined that she could return to "light duty" work by June 24, 2002, with restrictions. R. 481. Repp could lift no more than 10 pounds, occasionally reach above her shoulders, and could not push/pull, lift overhead, or climb. *Id.* Two and a half months post-operation, Dr. Greenspoon examined Repp again, and found her recovery "coming around slowly." R. 477. Dr. Greenspoon noted that Repp presented "no unusual subjective complaints or objective findings during the clinical exam." *Id.* On August 7, 2002, Dr. Beighley increased Repp's Prozac dosage again — and again noted a need for psychotherapy. R. 518.

On August 28, 2002 Repp visited physician assistant Jeff H. Glatter, RPA-C[6] with complaints of right shoulder pain and knee pain. R. 474. Mr. Glatter's recommended treatments were home

[6]Glatter's evaluation was reviewed and approved by Dr. Greenspoon within 24 hours of the office visit. R. 476.

exercise, physical therapy, reassurance, and rest.  R. 476.  Repp's work restrictions remained at "light duty," though Repp could now lift up to 20 pounds, could push/pull and lift overhead occasionally. *Id*.

Dr. Greenspoon himself examined Repp again on September 25, 2002.  R. 472.  He placed Repp at maximum medical improvement ["MMI"] and assigned a 6% impairment rating and lifted all of her movement restrictions.[7]  R. 473.  In a note at the end of his report, Dr. Greenspoon qualified his assessment as being only for Repp's left shoulder.  *Id*. He further noted specifically that "Repp is under the care of 2 other physicians for 2 other conditions, one of which (Dr. C Woodward) has her presently as EXCUSED from work, per the patient."  *Id*. (Emphasis in the original).  Dr. Greenspoon also included an explanatory note indicating that "the entry 'return to work : 6-24-02' should entirely be disregarded" as the entry was due to a computer error.  *Id*.

On October 17, 2002, Dr. Beighley noted that Repp had seen a therapist for three sessions, but missed her last appointment because she "did not feel like going" and never rescheduled.  R. 510.  Dr. Beighley further noted that Repp discontinued using Prozac and Trazodone without a "perceived loss of benefit."  *Id*.  Dr. Beighley's diagnosis remained unchanged, but he lowered Repp's GAF to 55. *Id*.  Dr. Beighley closed his report with the notation: "[a]t this time, [Repp] has no motivation to participate in treatment and I have done everything I can to encourage her to voluntarily get help." R. 511.

---

[7]Black's Law Dictionary defines "maximum medical improvement" as "[t]he point at which an injured person's condition stabilizes, and no further recovery or improvement is expected, even with additional medical attention." BLACK'S LAW DICTIONARY 1000 (8th ed. 2004).

On October 22, 2002, Repp underwent X-rays for her knees and right shoulder.  R. 468-70.

The next day, October 23, 2002, Dr. Greenspoon examined Repp and diagnosed right rotator cuff

disorder, right osteoarthritis of the AC joint and noted a deterioration of Repp's knee derangement.

R. 466.  Dr. Greenspoon prescribed home exercise, ice, non steroidal anti-inflammatories, and

reassurance for treatment. *Id*.  He imposed no restrictions and assessed Repp with a 6% impairment

rating, but noted that "[Repp] will likely be a candidate for surgical consideration" regarding her right

shoulder.  R. 466-67.

On November 4, 2002, Dr. Greenspoon again examined Repp for her knee complaints and

restricted her to lifting 10 pounds with occasional reaching above shoulders, pushing and pulling, and

kneeling and squatting. R. 461.  He ordered bilateral knee MRI scans.  *Id*.  During this exam, Dr.

Greenspoon reviewed Repp's right shoulder MRI which revealed impingement.  R. 456.

Repp sought a second opinion from Richard A. Hynes on November 7, 2002, complaining of

headaches, neck pain, and interscapular pain.. R. 289.  Dr. Hynes physical examination revealed that

Repp was "neurologically intact without focal deficit," but had pain in the paravertebral muscles

centrally, cervical spine into the trapezial rhomboid insertional point.  *Id*.  Upon a review of Repp's

MRIs, Dr. Hynes diagnosed cervical spondylosis with herniated nucleus pulposus greatest at C5-6,

C6-7 and status post left shoulder surgical intervention  *Id*.  Dr. Hynes opined that it was "fairly

evident" that Repp's herniated and degenerative discs were the cause of her pain.  R. 290.

Dr. Greenspoon examined Repp again on November 15, 2002, and reviewed two knee MRI

scans which were both normal. R. 453.  In his report, Dr. Greenspoon lifted all work restrictions for

both Repp's knees and her right shoulder and noted that "[n]o further orthopedic treatment for the

-26-

knee or shoulder related complaints" were available, and that Repp might "want to consider obtaining a second opinion."  R. 455.  Dr. Greenspoon further noted that there was a question as to whether Repp was "feigning illness."  R. 454.

On November 19, 2002, Repp saw Haleh Tabrah, M.D., for her depression.  R. 505.  Dr. Tabreh diagnosed major depressive disorder, moderate; anxiety disorder NOS; and pain disorder with medical and psychosocial factors.  R. 508.    Dr. Tabrah assigned a GAF of "approximately 60" prescribed increased Prozac dosage and continued psychotherapy.  *Id*.  Repp saw Dr. Tabrah again on December 13, 2002, and complained of hopelessness, persistent anxiety, crying spells, abdominal pain, and stress.  R. 502.  Repp also indicated that she watched her grandson every weekend and did gardening *Id*.  Dr. Tabrah increased Repp's Prozac dosage and recommended weekly psychotherapy. *Id*.

On January 7, 2003, Repp sought treatment from Todd B. Jaffe for pain management, complaining of stabbing, burning, and muscle spasms in the neck, arms ,and lower back.  R. 420.  Dr. Jaffe's PA, Moira Hizer, noted cervical HNP, internal derangement of the shoulders bilaterally, and lumbar facet changes.  R. 421. Ms. Hizer prescribed a series of cervical epidural injections, and noted that Repp was unable to work in her present condition.  *Id*.  On February 13, 2003, Repp underwent the first and only cervical epidural.  R. 414-15.

On February 27, 2003, non-examining state psychologist Edmund S. Bartlett, Ph.D., opined as to Repp's mental RFC.  R. 395.  Dr. Bartlett concluded that Repp was moderately limited in her ability to maintain attention and concentration for extended periods and her ability to perform activities within a schedule, maintain regular attendance, and be punctual.  *Id*.  According to Dr.

Bartlett, she was also moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without unreasonable rest. R. 396. Dr. Bartlett noted that Repp could perform simple and repetitious tasks "especially with a decrease in pain and improved physical mobility." R. 397. Dr. Bartlett further noted that Repp had a mild restrictions on daily living activities and maintaining social functioning, but suffered no episodes of decompensation. R. 409.

On March 13, 2003, Repp returned to Dr. Jaffe and reported a 20% reduction in pain after the epidural. R. 413. Dr. Jaffe's diagnosis remained unchanged, he performed no procedures during this visit, and instead recommended a follow-up examination with Dr. Hynes. *Id*. Repp underwent an ECOG at the Barranco Clinic on March 28, 2003, which revealed an endolymphatic hydrops (Meniere's disease) in the left ear – possibly the cause of Repp's dizziness. R. 593.

On April 28, 2003, physician assistant Glatter examined Repp for her right shoulder. R. 449. Mr. Glatter prescribed reassurance and rest, but "in light of persistent refractory symptoms unresponsive to non operative management" recommended arthroscopic surgery. R. 452. Mr. Glatter placed Repp under no work restrictions. *Id*.

On June 13, 2003, Repp followed up with Dr. Hynes regarding the ineffectiveness of Dr. Jaffe's epidural. R. 628. Dr. Hynes' physical examination revealed that Repp remained "unchanged" and that she had restricted range of motion "secondary to complaints of pain," but that Repp was "generally neurologically intact." *Id*. Repp told Dr. Hynes that her pain was "8 out of 10" but that she did not want "to keep taking . . . pain medication." *Id*. Dr. Hynes recommended a surgical solution,

and did not prescribe any medication or other treatment. *Id*. Dr. Hynes noted that Repp's work status remained unchanged. *Id*.

On June 16, 2003, Dr. Greenspoon examined Repp and concurred with Mr. Glatter's earlier surgical recommendation. R. 447. On June 19, 2003, Dr. Greenspoon performed arthroscopic subacromial decompression, capsulorraphy, and distal clavicle resection on Repp's right shoulder. R. 436. Dr. Greenspoon noted Meniere's disease, unspecified in his diagnosis summary. R. 431. On June 30, 2003 Repp returned for a follow-up to surgery and was examined by Mr. Glatter. R. 441. Mr. Glatter noted that Repp had no unusual complaints and recommended continued physical therapy and medication. *Id*.

On July 30, 2003, non-examining state agency physician Donald Warren Morford, M.D., opined as to Repp's physical RFC. R. 524-31. Dr. Morford found that Repp could occasionally lift up to 20 pounds; frequently lift up to 10 pounds; and sit about 6 hours in an 8-hour work day. R. 525. Repp also had to avoid repetitive use of her upper extremities; could only one-third of the time climb, balance, stoop, kneel, crouch, or crawl; and had to avoid concentrated exposure to heights and machinery. R. 526, 528.

On August 7, 2003, non-examining state psychiatrist Alejandro F. Vergara, M.D. opined as to Repp's mental RFC. R. 532. Dr. Vergara found that Repp was moderately limited in her ability to maintain attention and concentration for extended periods and to carry out detailed instructions. *Id*. Dr. Vergara also noted moderate limitations in Repp's ability to in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without unreasonable rest. R. 533. Repp also was moderately limited in her ability

to interact appropriately with the general public.  *Id*.  Dr. Vergara qualified these findings by noting that despite Repp's limitations, her adaptation and understanding were not "significantly impaired." R. 534.

On August 8, 2003, Repp visited Dr. Greenspoon for a recheck of her right shoulder.  Dr. Greenspoon noted that Repp was "improving nicely on the [right] shoulder" and cancelled her prescriptions for Darvocet and Lortab.  R. 602.  On September 18, 2003, Repp visited Mr. Glatter[8] for a post operative check of her left shoulder and a follow-up on her complaints of right shoulder pain. R. 598.  Mr. Glatter found that Repp's right shoulder had reached MMI with a 6% impairment rating, and her left shoulder was at MMI with a 6% impairment rating as of September 25, 2002.  R. 601. Mr. Glatter restricted Repp to lifting no more than 10 pounds and prohibited reaching above the shoulders, and noted that "given the extent of [Repp's] injuries and her work responsibilities as a truck driver, she will not be able to return to that profession in a full capacity and should be considered for job retraining/ vocational rehab."  *Id*.  Mr. Glatter further noted that Repp remained under the care of other physicians for injuries other than her shoulders, and although she would be able to work "light duty" for her shoulders, the other physicians might assign different restrictions.

According to Dr. Tabrah's progress notes dated October 6, 2003, Repp indicated that her anxiety was worsening, that she was "shaky" and saw "streaks of white" a couple of times per week, and had poor sleep, which left her exhausted most days.  R. 626.  Repp also indicated that her "animals [kept] her busy" and once per day "[walked] for exercise."  *Id*.  Dr. Tabrah noted that Repp's affect was dysthymic and prescribed Gabitril for pain and insomnia.  *Id*.

---

[8]His evaluation was again reviewed and approved by Dr. Greenspoon within 24 hours of the office visit.  R. 601.

-30-

In an undated progress note from Dr. Tabrah, Repp indicated that she was "up and down" and that she continued to have pain in her left arm and that she felt that her back problem needed to be addressed first. R. 625. Repp stated that she "[did] not do much outside of the house[,]" but indicated that "she [did] the house chores." *Id.*

On November 6, 2003, Dr. Woodward performed carpal tunnel release and an ulnar fat pad pedicle flap on Repp's left hand. R. 613. In a follow-up examination on November 14, 2003, Dr. Woodward noted that Repp was no longer numb, and that she had "full digital range of motion" on her left hand. R. 611. In his examination report, Dr. Woodward noted scheduling a second surgery for the right arm. *Id.*

In a 10 day post-operative report dated February 6, 2004, Dr. Woodward noted that Repp's numbness was gone, and that she had full digital range of motion.[9] On March 19, 2004, Dr. Woodward released Repp from his care at MMI with a 6% impairment rating. R. 605. Further, Dr. Woodward restricted Repp from heavy lifting and repetitive movements, and recommended vocational rehabilitation. R. 606.

On March 24, 2004, Dr. Tabrah listed Repp's impairments as depressive disorder NOS; Pain Disorder Associated with both Psychological Factors and Medical Conditions; and personality disorder NOS in a mental impairment questionnaire. R. 619. Though Dr. Tabrah's prognosis was guarded, she indicated that Repp was "<u>not</u> unable to work due to psychiatric reasons." R. 620. Dr. Tabrah further noted that Repp suffered no side effects from her medications and could be expected to be absent from work more than three times per month "due to pain[,] not [necessarily] psychiatric

---

[9]Presumably this examination was post right-hand carpal tunnel release and ulnar fat pad flap, but the surgical report is absent from the record.

illness." R. 621. Dr. Tabrah found Repp to be seriously limited, but not precluded from:  performing

unskilled work at a consistent pace without unreasonable rest; dealing with normal work stress;

understanding and remembering detailed instructions; carrying out detailed instructions; making plans

independently of others; interacting appropriately with the general public; traveling in unfamiliar

places; and using public transportation.  Finally, Dr. Tabrah opined that Repp had no restriction of

activities of daily living; slight restriction in social functioning; seldom had deficiencies of

concentration, persistence, or pace in work or other settings; and once or twice had episodes of

deterioration or decompensation in a work setting.  R. 623.

Repp was re-evaluated by Dr. Hynes' nurse Susan Clark, ARN, on June 2, 2004, who found

that Repp had tenderness in the cervical and lumbar spine, but had 5/5 upper and lower extremity

strength and walked with a non-antalgic gait.  R. 627.  In a medical opinion form also dated June 2,

2004, Ms. Clark filled out the following work restrictions for Repp:  occasionally lifting less than 10

pounds; ability to stand and walk less than half an hour during an eight hour work day; ability to sit

about 4 hours in an 8- hour work day; never twist, stoop, crouch, climb stairs or ladders, or reach

overhead.  R. 638-39.  Ms. Clark indicated that Repp's physical limitations included reaching,

handling, feeling, and pushing and pulling, but noted no limitations in Repp's fine manipulation.  R.

639.  Further, Repp was to avoid all exposure to extreme cold, extreme heat, wetness, humidity, noise,

machinery, and heights.  *Id*.  Ms. Clark predicted that Repp would miss work approximately 4 or 5

times a month due to her impairments. R. 640.  Dr. Hynes co-signed the opinion form filled out by Ms.

Clark.  R. 641.

The ALJ held his hearing on March 30, 2005, in Melbourne, Florida.  R. 571A-612A.  Repp testified that she suffered stabbing pains in her hands every day.  R. 581A.  Repp stated that she could painfully lift a gallon of milk with both hands.  R. 582A.  She stated that she could lift her arms over her head, but it caused pain in her shoulders.  R. 583A.  Repp testified that she felt knife-like pains in her lower back when she sits for five to ten minutes.  R. 584A.  She further testified that she could stand for approximately five minutes before having to sit down again.  R. 585A.  Repp testified that she could walk approximately one block before feeling pain in her lower back.  R. 585A.  Repp also stated that her neck swells and spasms due to disc problems. R. 586.  According to Repp, Dr. Hynes recommended surgery, but Repp refused on the hopes that a superior technique would be available at some point.  *Id.*

Repp described her Meniere's disease as "unpredictable" and suffered significant dizziness four to six times per month. R. 591A.  Repp testified that she got on average four to five hours of sleep per night.  R. 592A.  Repp also described her daily headaches as "starting in her lower neck and radiating out to the shoulders, up the back of her neck, and to the top of her head. R. 592A-593A.  The headaches caused her to be sick to her stomach and prohibited her ability to focus.  R. 593A.

Repp testified that she could no longer read because she could not keep her neck in a reading position, but that she used a computer occasionally.  R. 594A-595A.  Repp made her bed and dressed herself, did her own laundry, and went grocery shopping, but no longer did any housework, cooking, or gardening.  R. 595A-96A.  She stated that she did not "even have any . . . potted plants anymore." R. 596.  Repp further testified that the extent of her caring for her six year old nephew was sitting on the couch and watching him play on the floor.  R. 595A.

-33-

**B.     THE ANALYSIS**

Repp first contends that the ALJ did not give adequate weight to treating physician's opinions. Docket No. 9 at 9-12.  According to Repp, the ALJ ignored the opinions of treating physicians Hynes, Woodward, and Greenspoon, and improperly justified reliance on a state agency examiner's opinion over theirs.  *Id*. at 11.  The Commissioner argues that the ALJ considered Dr. Hynes' RFC evaluation, and properly discounted it as inconsistent with the record evidence.  Moreover, the Commissioner argues that Dr. Greenspoon's treating records support the ALJ's decision.  Docket No. 12 at 6-7.

In support of her contention, Repp cites a medical opinion form dated June 2, 2004.  It was filled out by Dr. Hynes' ARN, Susan Clark.  Repp cites the opinion as a treating physician's opinion which the ALJ improperly refuted.  Docket No. 9 at 10.  The form indicated that Repp could occasionally lift less than 10 pounds; stand and walk less than half an hour during an eight hour work day; sit about 4 hours in an eight hour work day; and never twist, stoop, crouch, climb stairs or ladders, or reach overhead.  R. 638-39.  Further, Repp had to avoid all exposure to extreme cold, extreme heat, wetness, humidity, noise, machinery, and heights.  *Id*.  Repp would miss work approximately 4 or 5 times a month due to her impairments. R. 640.

The ALJ properly found that Ms. Clark's conclusions in the form were inconsistent with the record evidence.  On two prior occasions, Dr. Hynes found Repp neurologically intact, and Ms. Clark's own examination revealed that Repp had 5/5 upper and lower extremity strength and walked with a non-antalgic gait.  R. 289, 627.  Thus, Repp's work restrictions as expressed in the form were internally inconsistent with both Dr. Hynes' and Ms. Clark's treatment notes.

-34-

Dr. Hynes' opinion was also inconsistent with the opinions of Repp's other treating physicians, particularly Dr. Greenspoon, who indicated that Repp should seek vocational rehabilitation. R. 21-22. Dr. Greenspoon treated Repp for her back, neck, shoulders, and knees and performed two shoulder surgeries from March 2002 to September 2003, and released her from his care with the recommendation that Repp seek job retraining and with no restrictions except that Repp was not to lift more than 10 pounds.[10]  R. 601.  It is unclear from the treatment notes whether the 10 pound weight restriction was for Repp's whole person, or merely for her right shoulder.  However, judging from treatment notes dated September 25, 2002, following Repp's left shoulder surgery, where Dr. Greenspoon released Repp to full duty with no weight restrictions for the left shoulder *only*, there is a strong inference that the 10 pound restriction was similarly limited to the right arm.  R. 473.  This inference, coupled with Dr. Greenspoon's express recommendation that Repp seek vocational rehabilitation, supports the ALJ's conclusion that Repp's limitations were not as severe as suggested by Dr. Hynes.  Because of the internal and external inconsistencies of treating physician Hynes' opinions, the ALJ had good cause to give more weight to non-examining physician Morford's evaluation that Repp could frequently lift 10 pounds or less, and occasionally could lift 20 pounds or less.  R. 525.

---

[10]Repp stresses that Dr. Greenspoon's notation indicating that her back to work date of June 24, 2002 should be disregarded shows that Dr. Greenspoon concurred with the opinions of Repp's other physicians.  Docket No. 9 at 12. However, Dr. Greenspoon's notations that Repp was under treatment from other physicians, and that she was excused from work by these physicians, appear to be per Repp's own statements, not Dr. Greenspoon's independent observations.  R. 473.  Dr. Greenspoon further explained that "[t]he entry 'return to work: 6-24-02' ... is due to a computer defaulting mechanism which is in the process of being remedied."  R. 473.  These facts do not suggest an implied  medical opinion that Repp was unable to work.

Regarding treating physician Woodward, Repp maintains that the ALJ mistakenly relied on Dr. Woodward's recommendation that Repp seek job retraining, which was dated six years before Repp's onset date.   Docket No. 9 at 11.   The ALJ did not err, however, and specifically cited to Dr. Woodward's March 19, 2004 determination that Repp was at MMI and should undergo vocational rehabilitation.   R.20, 605-06.

Repp next argues that the hypothetical question posed to the vocational expert did not comprehensively describe Repp's impairments, particularly her depression.   In support, Repp cites *Pendley v. Heckler*.[11]   The Commissioner contends that, although the ALJ did not use the word "depression," he nonetheless accurately represented all of the plaintiff's limitations.

In *Pendley*, the United States Court of Appeals for the Eleventh Circuit held that the ALJ's failure to ask the VE to take into account the plaintiff's severe anxiety and depression was reversible error.   *Pendley*, 767 F.2d at 1562.   Repp maintains that *Pendley* controls in this case, and that the ALJ's failure to include Repp's depression in his hypothetical was not harmless because, had that information been provided, the VE's testimony may have been different.   Docket No. 9 at 14.

The instant case is distinguishable from *Pendley* for two reasons.   First, in *Pendley*, the ALJ neglected to ask the expert to assume the claimant's anxiety or depression at all, and because of this, the court could not assume that the VE was aware of these impairments.   In the instant case, though the ALJ did not use the term "major depressive disorder" in his hypothetical, the ALJ nonetheless asked the VE to assume that Repp could only "mentally . . . be able to . . . understand, remember, and carry out only simple instructions and to perform simple routine tasks." R. 600A.   These were the

---

[11]767 F.2d 1561 (11th Cir. 1985).

exact limitations found to be imposed by Repp's depression according to Drs. Bartlett and Vergara. R. 395-97, 532. These limitations are also consistent with treating psychiatrist Tabrah's assessments.[12] R. 622-23. The ALJ accurately and comprehensively described Repp's mental limitations, and did not ignore or mischaracterize Repp's depression. Thus the ALJ properly relied on the VE's testimony as substantial evidence. *See Wind v. Barnhart*, 133. Fed. Appx. 684, 694 (11th Cir. 2005).

Further distinguishing the instant case from *Pendley* is the fact that Repp is represented by counsel, while the claimant in *Pendley* was *pro se*. *Pendley*, 767 F.2d at 1562. Repp's counsel appeared at the hearing and cross-examined the VE. R. 603A-611A. Repp's attorney made no objections to the ALJ's hypothetical, and during cross-examination did not ask the VE about whether her opinion would change if she also considered Repp's depression. *Id*. Failure to raise this issue in the hearing precludes Repp from raising the issue on appeal. *See Crawford v. Commissioner*, 363 F.3d 1155, 1161 (11th Cir. 2004); *Tillman v. Barnhart*, 144 Fed. Appx. 836, 840 (11th Cir. 2005).

Repp next contends that the ALJ failed to evaluate Repp's subjective pain complaints or properly articulate his application of the *Holt* pain standard. Docket No. 9 at 14. The Commissioner argues that the ALJ complied with the proper pain standard as set forth in the regulations and Eleventh Circuit precedent. Docket No. 12 at 7.

The ALJ's stated that Repp's "subjective complaints and symptoms . . . have been given a great deal of thought and carefully compared to other sources." R. 22. This statement alone

---

[12]The ALJ also noted that, even though Dr. Tabrah opined that Repp could work from a psychiatric standpoint, there was sufficient evidence in both Dr. Tabrah's own treatment notes and the RFC evaluations of the state agency physicians to support a finding of impairment. R. 22. The ALJ thus assigned more weight to the state agency opinions, who found Repp to be more limited than did Dr. Tabrah. R. 22.

inadequately articulates the ALJ's rejection of Repp's allegations of pain.  However, the ALJ heard Repp's pain testimony, which  included a description of daily stabbing pains in her hands, knife-like pains in her back, and daily headaches that made her nauseous.  The ALJ stated that he considered them in his decision.  R. 22, 581A-593A.  The ALJ noted that Repp testified that she took care of her personal needs, did her own laundry, and went grocery shopping.  R. 22.  The ALJ also referenced "other reports,"[13] which indicated that Repp did the house chores, and took care of her animals.  *Id*. Taking these into account, the ALJ found that Repp's activities were inconsistent with her allegations of pain.  *Id*.

Further, the ALJ reviewed Dr. Hynes' report showing that Repp was "neurologically intact" despite having herniated cervical discs, and found that these clinical findings, including those of other physicians, did "not appear to be of a degree capable of producing pain or limitations of incapacitating proportions."  R. 18, 22.  Though not directly citing *Holt*, the ALJ did not merely make conclusory statements regarding Repp's allegations.  The substance of the ALJ's analysis, taken together with specified record evidence, indicates that the ALJ properly followed the appropriate pain standard and is supported by substantial evidence.

Repp's fourth contention is that the ALJ failed to take into account the combined effect of all of Repp's impairments – particularly the effect of Repp's pain.  Docket No. 9 at 17.  The Commissioner argues that the ALJ's both expressly and implicitly indicated that he had considered all of Repp's impairments in his decision.  Docket No. 12 at 11.

---

[13] Namely Dr. Tabrah's treatment notes.  R.625-26.

The Commissioner is correct.  First, the ALJ's decision lists Repp's many severe impairments: bilateral carpal tunnel syndrome, status post left and right shoulder arthroscopy, cervical spondylosis, and *major depressive disorder*.  R. 21.  Second, the ALJ specifically found that these impairments were not severe enough "either singly or in combination" to indicate disability according to Appendix 1, Subpart P, Regulations No. 4.  *Id*.  Third, the hypothetical posed to the VE included limitations attributable to each of Repp's severe impairments:  light work (attributable to Repp's shoulders, back, and neck); climbing, balancing, stooping, kneeling, crouching, and crawling only up to one-third of the time (attributable to Repp's shoulders, back, and neck); avoiding repetitive use of the upper extremities, bilaterally (attributable to Repp's carpal tunnel syndrome and shoulders); only occasionally reaching with the upper extremities (attributable to Repp's shoulders); avoiding open heights and machinery (attributable to Repp's Meniere's Disease[14]); and mentally be able to understand, remember, and carry out only simple instructions and routine tasks (attributable to Repp's depression).  R. 600A.  According to both the decision and the record, the ALJ did not fail to consider Repp's combination of impairments.

Finally, Repp argues that the ALJ disregarded Repp's testimony and mischaracterized and misstated Repp's testimony as to her lifestyle.  Docket No. 9 at 18. The Commissioner contends that Repp's testimony was inconsistent with her own statements to various treating sources throughout the record.  Docket No. 12 at 10.

---

[14]Though the ALJ did not list Repp's dizziness as a severe impairment, the ALJ considered this impairment and its effect on Repp's RFC.

The ALJ found that Repp's "testimony and other reports reflect that she lives a fully functional type lifestyle. . . ." R. 22.  To support this finding, the ALJ states that Repp can take care of her own personal needs, prepare her own meals, perform light housekeeping, do her laundry, garden, take care of her plants and animals, take care of her grandchild, drive, visit friends and family, and go grocery shopping.  *Id.*  Several of these activities are not substantiated in the record, however.  For instance, the ALJ refers to Repp's visiting friends, but neither Repp's testimony nor the record indicated that she engaged in this activity.  Repp testified that she did not prepare meals and no longer gardened.  In fact, she clearly indicated that she no longer did any yard work and stated that she did not "even have any . . . potted plants anymore." R. 596.  Finally, Repp clarified that she did not engage in child care activities, and merely watched her nephew play from a seated position on her couch.  R. 595.

The ALJ's failure to accurately cite the facts supporting his finding that Repp led a "fully functional type lifestyle" constitutes harmless error.  The ALJ's credibility finding is supported by substantial evidence, the error notwithstanding.  Repp testified that she made her bed and dressed herself, did her own laundry, and went grocery shopping. Dr. Tabrah's treatment notes indicated that Repp did the house chores, that her animals kept her busy, and that Repp walked for exercise.

Further, the ALJ did not solely rely on Repp's activities in his credibility determination, but also considered objective medical evidence regarding Repp's incapacitating pain, namely Dr. Jaffe's and Dr. Hynes' records.  R. 18, 20.  These treatment records provide minimal objective clinical evidence and consist primarily of Repp's own statements to her physicians.  Dr. Jaffe's March 2003 report indicated that he cancelled Repp's epidurals and referred her back to Dr. Hynes after Repp complained that the injections were only 20% effective.  Dr. Jaffe's physical findings, however,

indicated that Repp still remained grossly intact neurologically.  When Repp followed up with Dr. Hynes three months later, he also found her to be neurologically intact, but noted that Repp complained that her pain was "8 out of 10."  R. 628.  Despite Repp's alleged pain, Dr. Hynes prescribed no treatment, and instead recommended surgery as an alternative to pain management – with the expectation that Repp would be at MMI within six months of surgery.  *Id*.  Repp testified that she elected to forego this surgical solution.  R. 586.

Repp's statements to Dr. Tabrah in October 2003 that she walked for exercise and did household chores are inconsistent with her previous pain complaints to Drs. Jaffe and Hynes — and are also inconsistent with her testimony at the hearing.  Dr. Jaffe and Dr. Hynes records indicate that Repp's physical condition remained unchanged during treatment, and the record does not show that Repp's impairments worsened between October 2003 and March 2005.  Further, Repp submitted no new medical evidence in support of her subjective pain complaints to the Appeals Council.  Though the ALJ cited some incorrect facts in his credibility determination, he nonetheless adequately set forth his reasons for disregarding Repp's subjective testimony.  When the incorrect facts are taken away, there remains substantial evidence both in the record and referenced in the ALJ's decision to support his credibility finding.

**VI.    CONCLUSION**

For the reasons stated above, the decision of the Commissioner should be **AFFIRMED**. Failure to file written objections to the proposed findings and recommendations in this report pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 6.02 within ten days of the date of its filing shall bar an aggrieved party from a *de novo* determination by the district court of issues covered in the report, and

shall bar an aggrieved party from attacking the factual findings on appeal.  Any party appealing this

decision shall file and serve a copy of the oral argument transcript within thirty days of this order.

**DONE AND ORDERED** this 22nd day of November, 2006.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

The Honorable Gregory A. Presnell
United States District Judge

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL                33602

The Honorable Robert D. Marcinkowski

Administrative Law Judge

c/o Social Security Administration

Office of Hearings and Appeals

Suite 300, Glenridge Building

3505 Lake Lynda Drive

Orlando, FL           32817